NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2022 IL App (4th) 210530-U

NOS. 4-21-0530, 4-21-0531 cons.

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
January 25, 2022
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| *In re* H.K., a Minor | ) | Appeal from the |
| | ) | Circuit Court of |
| (The People of the State of Illinois, | ) | DeWitt County |
|     Petitioner-Appellee, | ) | No. 19JA4 |
|     v.      (No. 4-21-0530) | ) | |
| Sarah M. and Eric K., | ) | |
|     Respondents-Appellants). | ) | |
| | ) | |
| ------------------------------------------------------------------------ | ) | |
| *In re* E.K., a Minor | ) | No. 19JA5 |
| | ) | |
| (The People of the State of Illinois, | ) | |
|     Petitioner-Appellee, | ) | |
|     v.      (No. 4-21-0531) | ) | Honorable |
| Sarah M. and Eric K., | ) | Karle Eric Koritz, |
|     Respondents-Appellants). | ) | Judge Presiding. |

JUSTICE CAVANAGH delivered the judgment of the court.
Justices DeArmond and Turner concurred in the judgment.

**ORDER**

¶ 1    *Held*:  The appellate court affirmed, concluding the trial court's fitness determination was not against the manifest weight of the evidence.

¶ 2    Respondents, Sarah M. and Eric K., appeal from the trial court's order terminating their parental rights to their minor children, H.K. (born February 16, 2011) and E.K. (born January 20, 2016). On appeal, respondents argue the court's fitness determination was against the manifest weight of the evidence. They do not challenge the court's best-interest determination. We affirm.

¶ 3                                    I. BACKGROUND

¶ 4            On June 11, 2019, the Department of Children and Family Services (DCFS) took protective custody of the two minors when it was discovered that respondents' infant daughter had been transported to the hospital on June 9, 2019, and later died from "positional asphyxia." The infant's toxicology results indicated she had alcohol, marijuana, and barbiturates in her system at the time of her death. The minors were placed with their paternal grandmother.

¶ 5            On June 13, 2019, the State filed a petition for adjudication of wardship, alleging the minors were neglected pursuant to section 2-3(1)(b) of the Juvenile Court Act of 1987 (Juvenile Court Act) (705 ILCS 405/2-3(1)(b) (West 2018)), in that their environment was injurious to their welfare when they resided with respondents due to their exposure to substance abuse.

¶ 6            The State's petition alleged neglect based upon respondents' history of and untreated substance abuse. Both parents used Suboxone, other than prescribed, while caring for the minors and, according to the investigators, allowed "steroids, bags of syringes, a crack pipe and spoon, a one-hitter pipe, and unsecured prescription medications with pills on the floor, counter, drawers[,] and cupboards to be accessible to the minor[s] within the family residence[.]" The State further alleged (1) both respondents had a prior intact-family case through the Baby Fold, in which they had failed to complete recommended services, and (2) respondent mother tested positive for methamphetamine and amphetamine on June 9, 2019, at the time of the infant's death.

¶ 7            On September 12, 2019, the trial court entered an adjudicatory order, finding the minors neglected as alleged and based on the grounds set forth in the petition. On October 3, 2019, the court entered a dispositional order, finding respondents unfit due to their drug-abuse issues. The court made the minors wards of the court and appointed DCFS as guardian.

¶ 8    On January 15, 2021, the State filed a petition to terminate respondents' parental rights, alleging they had failed to make (1) reasonable efforts to correct the conditions that were the basis for the minors' removal from their care during the nine-month period from October 4, 2019, to July 4, 2020 (750 ILCS 50/1(D)(m)(i) (West 2020)); (2) reasonable progress toward the return of the minors to their care between October 4, 2019, and July 4, 2020 (750 ILCS 50/1(D)(m)(ii) (West 2020)); and (3) reasonable progress toward the return of the minors to their care between April 15, 2020, and January 15, 2021 (750 ILCS 50/1(D)(m)(ii) (West 2020)).

¶ 9    In March 2021, the trial court conducted a fitness hearing. Sabrina Cavanaugh, the caseworker with the Center for Youth and Family Solutions (CYFS), testified she had been assigned the case upon its opening and, since that time, respondents' goals had remained the same. Those goals were to (1) maintain stable housing, (2) maintain a legal means of income, (3) participate in substance-abuse evaluations and any recommended treatment, (4) participate in weekly drug screens, (5) successfully complete parenting classes, (6) attend individual counseling, and (7) attend visits with the minors supervised by the foster parent (respondent father's mother). Cavanaugh testified that respondents had not successfully engaged in *any* of those goals, except for visitation, during the life of the case, including the nine-month periods of October 4, 2019, to July 4, 2020, and April 15, 2020, to January 15, 2021.

¶ 10    According to Cavanaugh, respondents were either homeless, living in a motel, or never provided their address to her. Neither respondent produced proof of income. They each participated in substance-abuse evaluations and entered residential treatment but, both left the treatment facility without successful completion. Respondent mother submitted four drug screens and respondent father submitted three. All others were noted as failures-to-appear.

¶ 11    Cavanaugh testified, because respondents' "parenting skills were not necessarily

lacking," CYFS agreed to do a "special" parenting class for respondents where a DCFS nurse consultant would meet them at their home. However, this "special" class never came to fruition because respondents were either homeless or in residential treatment and then, never asked for the class to be scheduled. Both respondents participated in an individual-counseling assessment but never followed through with sessions. Visitation went fairly well with no major issues though Cavanaugh noted respondents had made some inappropriate comments to the minors indicating the minors would be home by certain dates or holidays. Cavanaugh testified respondents continued to use substances.

¶ 12 Respondent father testified he had been living with his grandfather in Clinton for two months, but he had not yet had a chance to tell the caseworker. Regarding his housing over the life of the case, he said it was difficult obtaining housing without employment. He explained he was terminated from his job at Caterpillar because his boss did not like the uncertainty of his absence due to his requirement for drug screens. The drug-screen requirement had also caused him difficulty in obtaining new employment. The pandemic also made it difficult to obtain employment because the hotel in which they lived was "constantly locking down." He said even though he was not working, it "was just sometimes it was tough" to get to the drug screens and, the facility and the people at the drug-screen location were "gross," not caring about hygiene while coughing and sneezing. He did not want to be exposed to illness while living with his 93-year-old grandfather.

¶ 13 Respondent father said he left residential treatment because the facility would not allow him to have his anti-anxiety and depression medications. He said it was "a risk for [his] life" if he was unable to take his prescription medication. He explained he continued to suffer grief and anxiety about the death of his infant. In his opinion, the grief from losing his child had prohibited him from engaging in services and had negatively affected his well-being. However, he said, he

never gave up on the ability to visit with the minors.

¶ 14 Respondent mother testified that since October 25, 2020, she had been employed as a full-time, live-in caretaker for respondent father's grandfather. She said she agreed with respondent father's testimony about the difficulty of complying with services. She said she left residential treatment after 30 days on January 17, 2019, because they promised her she would "get out by [her] son's birthday, so [she] did leave, [she guesses], unsuccessfully." However, she had been attending The Crossing's outpatient program and doing drug screens there since she left residential treatment. She said Cavanaugh knew she was involved at The Crossing and had signed the necessary waivers. However, she had not given Cavanaugh any documentation of treatment or proof of drug screens.

¶ 15 Respondent mother also testified she was participating in grief counseling at SIU Family Medicine in Decatur but, she had not seen her counselor for approximately five months. Again, she said Cavanaugh was aware of her attendance and that she had signed the necessary waivers. Respondent mother said she had been taking Suboxone since 2016.

¶ 16 The trial court continued the fitness hearing to a later date. When the parties reconvened, in rebuttal, the State recalled Cavanaugh as a witness. She testified she was not aware of respondent mother's participation in outpatient treatment at The Crossing. Cavanaugh attempted to contact the agency after hearing respondent mother's testimony but, there was no consent on file. Therefore, she was unable to verify respondent mother's testimony. Cavanaugh texted respondent mother asking for consent, but respondent mother did not respond.

¶ 17 On March 25, 2021, at the close of the hearing, the trial court found the State had sufficiently proved respondents were unfit as alleged and entered a written order to that effect.

¶ 18 On May 5, 2021, after convening for a best-interest hearing, the parties informed

the trial court that respondents stipulated to "the contents of the [best-interest] report and the finding that it's in the best interest of the [m]inors to terminate the parental rights and proceed with adoption with the grandmother." The court advised it would be "more appropriate" for it to make an independent determination as to the minors' best interests rather than a determination based upon the parties' stipulation. In doing so, the court considered the best-interest reports, the evidence presented at the fitness hearing, and the statutory best-interest factors and found it to be in the minors' best interests to terminate respondents' parental rights.

¶ 19        This appeal followed.

¶ 20                                II. ANALYSIS

¶ 21        On appeal, respondents assert the trial court's fitness findings were against the manifest weight of the evidence. We disagree.

¶ 22        The Juvenile Court Act of 1987 sets forth a two-stage process for the involuntary termination of parental rights. 705 ILCS 405/1-1 *et seq.* (West 2020). Initially, the State must establish, by clear and convincing evidence, that the parent is unfit under any single ground set forth in section 1(D) of the Adoption Act (750 ILCS 50/1(D) (West 2020)). See 705 ILCS 405/2-29(2), (4) (West 2020); *In re J.L.*, 236 Ill. 2d 329, 337 (2010). If the trial court finds the parent unfit, the State must then show by a preponderance of the evidence that termination of parental rights is in the child's best interest. See 705 ILCS 405/2-29(2) (West 2020); *In re D.T.*, 212 Ill. 2d 347, 367 (2004). In this appeal, respondents challenge only the trial court's finding at the first stage—the finding of unfitness.

¶ 23        The trial court has the best opportunity to observe the demeanor and conduct of the parties and witnesses, and it is in the best position to determine the credibility and weight of the witnesses' testimony. *In re E.S.*, 324 Ill. App. 3d 661, 667 (2001). In matters involving minors,

the court receives broad discretion and great deference. *Id.* We will not disturb a trial court's finding with respect to parental unfitness unless it is against the manifest weight of the evidence. *In re Gwynne P.*, 215 Ill. 2d 340, 354 (2005) A decision is against the manifest weight of the evidence only where the opposite conclusion is clearly apparent. *Id.*

¶ 24 Respondents were found unfit on two grounds: (1) they failed to make reasonable efforts to correct the conditions that were the basis for the removal of the minors during a specified nine-month period following the adjudication of neglect (750 ILCS 50/1(D)(m)(i) (West 2020)) and (2) they failed to make reasonable progress toward the return of the minor during two specified nine-month periods following the adjudication of neglect (750 ILCS 50/1(D)(m)(ii) (West 2020)). Because only one ground, if properly proven, is sufficient to support the trial court's finding of parental unfitness, we will address the second ground and analyze respondents' failure to make reasonable progress. See *In re D.D.*, 196 Ill. 2d 405, 422 (2001).

¶ 25 Reasonable progress is measured by an objective assessment of a parent's progress in a given nine-month period toward reunification with the minor, which includes compliance with service plans and court directives. *In re C.N.*, 196 Ill. 2d 181, 216-17 (2001). A parent will be found to have made reasonable progress if and only if his or her actions during that period indicate the court will be able to order the minor returned to his or her care in the near future. *In re L.L.S.*, 218 Ill. App. 3d 444, 461 (1991).

¶ 26 Respondents claim, "given their circumstances," they made reasonable progress by "tackl[ing] the services required." They claim they both obtained counseling assessments, participated in substance-abuse evaluations, and entered residential treatment. However, we find the evidence demonstrated more than what respondents suggest. Neither respondent followed through with and successfully completed these tasks.

¶ 27 The trial court's fitness findings were not against the manifest weight of the evidence, as the evidence showed both parents failed to substantially fulfill their obligations under their respective service plans. Both respondents were to obtain and maintain stable housing and legal employment. Neither provided proof of housing or income to Cavanaugh during the relevant time frames.

¶ 28 Respondents were also to engage in substance-abuse treatment, maintain sobriety, and participate in random drug screens. Although they performed their initial assessment, each respondent voluntarily left residential treatment before completion and failed to participate in the required drug screens. Respondent father claimed he was unable to maintain employment because his employer would not accept him leaving work at unknown random times to submit to a screen. However, the evidence demonstrated respondent father rarely, if ever, did such a thing. He participated, over the course of two years, in three random screens. His testimony did not logically support his claim that he was unable to get or keep a job because of his requirement to report for random drug screens when, in reality, he completely failed to report.

¶ 29 Cavanaugh testified neither respondent made *any* progress on the service plans over the life of the case. That is, respondents completely failed to comply with their service-plan requirements and were no closer to being able to safely parent the minors after two years than they were at the beginning of the case. Accordingly, we agree with the trial court that respondents failed to make reasonable progress during the relevant time periods, as there was no reason to believe the minors could be returned to their care in the near future when they had completely failed to address the cause for concern.

¶ 30 III. CONCLUSION

¶ 31 For the foregoing reasons, we affirm the trial court's judgment.

¶ 32          Affirmed.